JOHN J. SHAEFFER (SBN 138331)
    JShaeffer@FoxRothschild.com
BENJAMIN H. McCoy (*pro hac vice forthcoming*)
    Bmccoy@FoxRothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone: 610.397.7972
Facsimile: 310.556.9828

Attorneys for Plaintiff,
BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, A DIVISION OF
HEALTH CARE SERVICE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, a division of HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company,<br><br>Plaintiff,<br><br>v.<br><br>ASANA RECOVERY, INC., BEACHFRONT SOBER LIVING, INC., ASANA BUY SELL LLC, MARK SHANDROW, ADAM SHANDROW, JONATHAN HAGEN, CHRISTIAN SMALL, M.D., JOHN DOES 1-50, AND ABC CORPS. 1-50<br><br>Defendants. | Case No.: 8:25-cv-735<br><br>**COMPLAINT FOR**<br>(1) **Fraud and Fraudulent Concealment**<br>(2) **Negligent Misrepresentation**<br>(3) **Intentional Interference with Economic/Contractual Relationships**<br>(4) **Aiding & Abetting Tortious Conduct**<br>(5) **Violations of Business and Professional Code Section 17200, *et seq*.**<br>(6) **Money Had and Received**<br>(7) **Unjust Enrichment, Quantum Meruit, Restitution** |

Plaintiff, Blue Cross and Blue Shield of Oklahoma, an unincorporated division of Health Care Service Corporation, a Mutual Legal Reserve Company ("BCBSOK"), by way of this Complaint against Defendants Asana Recovery, Inc. ("Asana"), Beachfront Sober Living, Inc. ("Beachfront"), Asana Buy Sell LLC ("Asana Buy Sell"), Mark Shandrow , Adam Shandrow, Christian Small, M.D. ("Dr.

Small"), Jonathan Hagen, ("Hagen"), John Does 1-50, and ABC CORPS. 1-50 (collectively, the "Defendants"), alleges as follows:

## INTRODUCTION

1.     In or around June of 2023, JC – a member of an Oklahoma-based Native American tribe suffering from Substance Use Disorder ("SUD") – was contacted via social media by another member of her tribe, KB.

2.     Unbeknownst to JC, KB was working for Asana as a "body broker." KB had previously been a patient at Asana and now was paid kickbacks to track down potential patients and traffic them to California for "treatment" at Asana.

3.     Trusting KB and in need of treatment, JC agreed to enroll in Asana and was flown out to California at no charge. Upon arrival at Asana, she was forced to strip off her clothes, hand over her cell phone and all other belongings, and confronted with an agreement to stay at Asana for 90 days, far longer than the maximum 30-days she had been told prior to arrival.

4.     Over the next 10 days, JC discovered the treatment and experience she had been promised was a lie. She received one short virtual session with an unknown individual, was provided unknown medication from what appeared to be a fellow patient, and had one "treatment session" that entailed going for a hike.

5.     After Asana ignored her repeated requests to see an actual therapist and receive real treatment, JC attempted to call her family and leave. Asana refused to let her use her phone. When she then sought to leave, Asana refused to return her phone or belongings and prohibited her from going outside.

6.     Eventually, when Asana staff were not watching, JC put what she could in a laundry basket and escaped out the front door. After some time, she found somebody on the street nearby and was able to use their cell phone to arrange to be picked up.

7.     During her short stay, Asana billed for and received thousands of dollars in payments from JC's health benefits plan, which was issued by Plaintiff BCBSOK.

8.    Through this lawsuit, BCBSOK seeks to remedy a wide-ranging fraudulent scheme that targeted vulnerable individuals under the guise of treatment, but with the real goal of profit.

9.    JC's experience was typical of patients that were cycled through a scheme that involved fraudulent acts from beginning to end.

10.    To start the scheme, Asana had to find and induce patients into treatment. To do this, Asana (i) paid kickbacks to body brokers to find and ship BCBSOK members from Oklahoma to California for "treatment," (ii) paid active patients for phone numbers and "leads" for potential patients who might be in need of treatment, (iii) targeted potential patients with false sales pitches, and (iv) paid patients to provide "positive" online reviews in an effort to cover-up the deluge of negative reviews that were flooding online resources for those seeking SUD treatment.

11.    Once enrolled, Asana provided minimal or non-existent treatment. Oftentimes, treatment was overseen by other patients and/or individuals who were not licensed or qualified.

12.    Like JC, many patients desired to leave when they realized treatment was not forthcoming. Because this would thwart the ability to bill insurance, Asana went to appalling lengths to stop patient departures, such as: cutting off phone access, refusing to return patient belongings, and – worst of all – refusing to provide patients their needed medications.

13.    For other patients, Asana induced them to stay through "employment," during which Asana often continued to bill for insurance, thereby obtaining free labor through insurance payments.

14.    Once a patient completed detox treatment, Asana – in conjunction with Beachfront and Asana Buy Sell – provided free housing to induce patients to receive their "outpatient" treatments with Asana so insurance payments could continue to come in.

15.    The defendants here are the entities and individuals who spearheaded this scheme. For them, SUD treatment was just a cover for their ultimate prize: money. And they got a lot of it: over $10 million in ill-gotten gains from BCBSOK alone. BCBSOK files this suit to remedy at least some of the harm Defendants have caused.

## THE PARTIES AND THEIR ROLES

16.    Plaintiff is an unincorporated division of Health Care Service Corporation, an Illinois mutual legal reserve corporation with its principal place of business in Illinois. As it pertains to Oklahoma and Oklahoma-based insurance plans, Health Care Service Corporation does business as Blue Cross and Blue Shield of Oklahoma.[1]

17.    Asana is a privately held California stock corporation with a principal place of business at 1730 Pomona Avenue, Suite 3, Costa Mesa, California 92627. Asana is owned and operated by Defendants Mark and Adam Shandrow. Asana submitted healthcare claims to BCBSOK making numerous misrepresentations that resulted in millions of dollars' worth of payments. As explained herein, the statements Asana made on those claims were false and fraudulent. Asana received millions of dollars in wrongful payments from BCBSOK and used some of those funds to pay illegal kickbacks to the other Defendants and BCBSOK's own members.

18.    Defendant Beachfront is a privately held California stock corporation with a principal place of business at 1730 Pomona Avenue, Suite 3, Costa Mesa, California, 92627. Beachfront is owned and operated by Defendants Mark and Adam Shandrow. Upon information and belief, Beachfront is the legal entity that owns some of the sober living homes BCBSOK members were housed in while receiving outpatient treatment.

19.    Defendant Asana Buy Sell is a California limited liability company with

---

[1] That is, Health Care Service Corporation and BCBSOK are not separate entities.

a principal place of business at 1730 Pomona Avenue, Suite 3, Costa Mesa, California 92627. Asana Buy Sell is owned and operated by Defendants Mark and Adam Shandrow. Mark and Adam are Asana Buy Sell's sole members. Upon information and belief, Asana Buy Sell owns some of the sober living homes BCBSOK members were housed in while receiving outpatient treatment.

20.    Mark Shandrow is a resident of California with an address of 1621 Cornwall Lane, Newport Beach, CA 92660. At all relevant times, Mark, along with his brother Adam, was the owner and ultimate beneficiary of Asana, Beachfront, and Asana Buy Sell. Mr. Shandrow was personally involved in the conduct herein. He set the policies and procedures of those working for Asana relating to patient recruitment and advertising, was responsible (along with his brother) for directing the payments to body brokers and patients, and was personally involved with setting up free housing for patients.

21.    Mark Shandrow is no stranger to body brokering and kickbacks. After spending approximately sixteen (16) years in real estate, Mark Shandrow co-founded Solid Landings Behavioral Health, Inc. ("Solid Landings"), a California SUD enterprise, which he operated with his high school friend, Steven Fennelly, and Mr. Fennelly's then-girlfriend.[2] Under Mr. Shandrow's watch, Solid Landings ended up in bankruptcy after an investigation from the California Department of Insurance and the cessation of insurance payments due to suspicions of kickbacks and body brokering.[3]

22.    Defendant Adam Shandrow is a resident of California with an address of 209 Linden Avenue, Long Beach, California 90802. Along with Mark, Adam

---

[2] *See In re Solid Landings Behavioral Health, Inc., et al.*, Case No. 8:17-bk-12213 (Bankr. C.D. Cal. 2017).

[3] In the bankruptcy proceedings, Mark, along with Mr. Fennelly and Ms. Perry, purchased the assets of Solid Landings and its related enterprises, including Cedar Creek Recovery, Inc. ("Cedar Creek"), EMS Toxicology ("EMS"), Silver Rock Recovery ("Silver Rock"), and Sure Haven, Inc. ("Sure Haven"). Upon information and belief, Mr. Shandrow used all or part of the purchased Solid Landings assets to start his own SUD treatment facility (Asana).

Shandrow is the owner and ultimate beneficiary of Asana, Beachfront, and Asana Buy Sell. With an employment history in staffing, Adam Shandrow was personally involved in patient brokering as well as the provision of free housing.

23.   Jonathon Hagen is the executive director of Asana, with an address of 19005 Fairmont Lane, Huntington Beach, CA 92648-6124. He personally instructed staff on documenting treatment and took a leading role in intake and organization of patients.

24.   Dr. Christian Small is the medical director of Asana with a current address of 215 S. Hickory St, St. 114, Escondido, CA 92025-4360. Dr. Small personally certified the claims on Asana's behalf and prescribed medications. According to claim submissions, Dr. Small served as the attending or supervising professional for essentially every patient at Asana. As explained herein, Dr. Small actually provided very little, if any, actual services. In reality, he and Asana abused his license to create the appearance that qualified professionals were providing services at Asana.

25.   The true names of Defendants John Does 1 through 50, and ABC CORPS. 1 through 50, inclusive, are unknown and BCBSOK sues them by such fictitious names under California Code of Civil Procedure § 474. BCBSOK alleges that each Defendant designated as a Doe Defendant is legally responsible to it for the damages alleged herein. When BCBSOK ascertains the true names, involvement, and capacities of Does 1 through 50 and ABC CORPS. 1 through 50 inclusive, it will seek leave to amend the Complaint.

26.   At all relevant times, each Defendant, whether fictitiously named or otherwise, was the agent, servant, or employee of the others, and was acting within the scope of such agency, enterprise, relationship, services, or employment.

## ALTER EGO/CONSPIRACY/AIDING AND ABETTING ALLEGATIONS

27.   All Defendants are liable for the obligations of each other as alter egos because they each treated the other entities as their own. Upon information and

belief, as alleged herein, Defendants commingled funds and did not differentiate between Asana and the corporate legal entities. The individuals were all owners, employees, and/or agents of the entity-defendants.

28.    Individual Defendants are also alter egos of the corporate entities, as they created these entities, in whole or in part, for an improper purpose, including the perpetration of the fraudulent scheme alleged herein. It would therefore be unjust to recognize the individual Defendants as separate from the entity Defendants. Given this relationship, all allegations can be applied equally between the individual defendants and the entity Defendants.

29.    All Defendants are also liable as alter egos of each other as they worked together to monetize the fraudulent conduct through consultation and the submission of fraudulent claims, then split the payments that were ultimately made.

30.    Defendants formed a group of more than two people that amounted to a civil conspiracy. They agreed and conspired to commit the acts set forth herein. They worked together by, for example, performing individual tasks in concert to cause the submission of fraudulent misrepresentations and omissions, and further to evade detection. As such, each Defendant that did not physically commit the tort themselves shared with the immediate tortfeasor a common place or design in its preparation. They are thus jointly and severally liable for all damages arising from the conspiracy.

31.    Each Defendant knew of the misconduct alleged herein, actively participated in the scheme(s), and provided substantial assistance or encouragement to the other tortfeasors. When they undertook to provide substantial assistance or encouragement to other tortfeasors, they knew the conduct was tortious. As such, each Defendant is liable for all torts committed as part of the scheme.

## JURISDICTION AND VENUE

32.    This Court has diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states.

33.     Venue is proper in the Central District of California, Southern Division, under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to BCBSOK's claims occurred in this judicial district, and the Southern Division in particular.

## RELEVANT INDUSTRY BACKGROUND

### I.     BCBSOK RELIES UPON PROVIDERS TO SUBMIT ACCURATE INFORMATION AND CERTIFY COMPLIANCE WITH APPLICABLE LAWS

34.     BCBSOK administers and/or insures health benefits plans for the government, employers, and private individuals. BCBSOK was the primary insurer in Oklahoma offering individual health plans pursuant to the Patient Protection and Affordable Care Act ("ACA").

35.     Individuals enrolled in these plans are referred to as BCBSOK "members." Individuals and entities that provide services are known as "providers."

36.     To obtain payment for services rendered to BCBSOK members, healthcare providers submit standard healthcare "claims forms" (CMS 1500, HCFA, or UB-04 forms) representing the services provided to the respective BCBSOK members.

37.     In submitting these claim forms, providers utilize industry standard terminology and procedures. Providers also must accurately set forth other information regarding the treatment, such as the place where the service occurred, the type of treatment offered, and the diagnosis. In submitting claims, Providers further represent that the treatment provided was medically necessary and appropriate and certify that they followed all applicable laws and regulations, have not violated applicable laws, and that their claim forms are accurate.

38.     BCBSOK relies upon providers to submit truthful and accurate information and representations in their claim forms so that it can accurately determine whether the treatment is covered by a members plan as well as the amount of payment owed.

39.    In turn, providers intend for BCBSOK to rely on statements in a given claim form to determine payment. For those reasons, the law, claim forms, and BCBSOK require providers to certify the accuracy of the information contained in claim forms.

## II.    OVERVIEW OF SUD TREATMENT

40.    There are various levels of care to SUD treatment that vary in their intensity. The two most intense levels are relevant here.

41.    The most intense level of care is inpatient treatment (a/k/a "detox"). Inpatient means that the patient is housed in a qualified facility (*e.g.*, hospital, treatment facility) and under 24-hour care. The goal at this level is withdrawal management and stabilization. This treatment is shorter, often lasting a few weeks.

42.    After discharge, the next level of care is "intensive outpatient treatment," which is divided into two subsecions: partial hospitalization ("PHP") and intensive outpatient treatment ("IOP"). The goals of PHP and IOP vary depending on patient need, but they ultimately seek to allow a patient to advance to general outpatient care as opposed to intensive care.

43.    Each level of treatment is supposed to be temporary. The more intense treatment (inpatient treatment) tends to be shorter, while less intensive treatment (outpatient treatment) tends to be longer. Once a patient reaches their baseline – or stops showing improvement – health benefit plans will usually stop paying that level of care.

44.    Importantly, PHP and IOP are performed outpatient, meaning they do not involve housing patients and care is delivered in temporary settings (*e.g.*, appointments).

45.    Nevertheless, many patients choose to live away from their home environments, at least immediately following detox, to remain free of the stressors that may have contributed to their addiction. Hence, the creation of "sober living homes," which are supposed to provide a controlled living environment for

individuals going through more intense outpatient treatment until they are ready to return to their normal setting. As explained herein, many providers weaponize these homes to induce patients to remain under their control so they can bill for insurance.

46.    While health insurance pays for outpatient treatment, it does not cover rent or housing costs, regardless of whether an individual lives in a sober living home, an apartment, or their own home.

## DEFENDANTS' FRAUUDLENT SCHEME

47.    As noted above, the fraud in this action permeates every level of the treatment cycle and covers a staggering array of overlapping conduct, including: body brokering, false advertising, fraudulent enrollment, cost-share waivers, fraudulent billing, and illegal kickbacks.

I.    **ASANA INDUCES PATIENTS INTO TREATMENT THROUGH BODY BROKERING AND FALSE ADVERTISING**

48.    The first step in the scheme was to induce potential patients into treatment. This required finding patients, convincing them to come to treatment, and taking whatever steps necessary to enroll them in insurance plans.

49.    To find patients, Asana employed the following fraudulent means:

a. *False promises to **prospective** patients*: Asana aggressively flooded recovery group social media groups and certain populations in Oklahoma – particularly Native American tribes – with false or misleading sales pitches about the quality of treatment at Asana and perks such as "private chefs." For example, Asana represented that they had "reached an agreement" with the state of Oklahoma to provide treatment and so individuals with BCBSOK plans could obtain a good deal for treatment. There was no such agreement. By way of another example, another patient (DD) was promised a payment of $10,000.00 by Asana's Admissions Director if he enrolled in a BCBSOK plan and attended Asana for a certain length of time.

b. *Paying **current** patients for "leads" and false reviews*: While patients were in active treatment, they were paid by staff members in cash or gift cards if they provided contact information that led to new clients. Active patients were also given cash and/or gift cards in return for leaving positive reviews on Google, Yelp, and social media pages, no matter how false or misleading the review was. This deceived prospective patients into enrolling at Asana based upon fraudulent or misleading reviews.

c. *Body Brokering using **former** patients*: Certain Asana "employees" and/or "contractors" were paid kickbacks for every patient they were able to find and successfully enroll into treatment. The most notable brokers were individuals KB and BS, self-titled "outreach staff" that brokered an exceptionally large number of patients. To continue capitalizing on these individuals, Asana sent KB and BS back to Oklahoma to broker more individuals once their insurance could no longer be billed.

## II.   IF PROSPECTIVE PATIENTS DID NOT HAVE INSURANCE, ASANA TOOK ACTION TO FRAUDULENTLY ENROLL THEM

50.    Many Oklahoma patients did not have health benefit plans prior to treatment or, if they did, they were low-paying governmental plans. To remedy this, Asana endeavored to fraudulently enrolled these individuals in BCBSOK individual exchange act plans. Asana specifically targeted these plans due to their robust out-of-network, out-of-state benefits.

### A. Background on BCBSOK Exchange Plans

51.    As background, the ACA created insurance marketplace exchanges through which individuals (among others) can enroll in privately insured health benefit plans. During the relevant time, BCBSOK offered various statewide health benefit plans in Oklahoma on the federal health insurance exchange, located at

healthcare.gov.

52.    BCBSOK Plans can be obtained only during "Open Enrollment," which occurred as follows during the relevant time:

      a.    2021: November 1, 2020 – December 15, 2020

      b.    2022: November 1, 2021 – January 15, 2022

      c.    2023: November 1, 2022 – January 15, 2023

      d.    2024: November 1, 2023 – January 16, 2024

53.    Enrollment outside of the "open enrollment" period – called "Special Open Enrollment" – requires a qualifying event, such as a loss of coverage under a pre-existing plan. To get "Special Open Enrollment," an applicant must certify under penalty of perjury that they experienced a qualifying event.

54.    Applicants must also be residents of Oklahoma, which requires submitting an Oklahoma address in the application. Once enrolled, they must remain as residents of the service area to be covered under the terms of the plan. If they move outside of the service area, their coverage will terminate.

**B. Asana's Fraudulent Enrollments**

55.    Asana took actions to fraudulently enroll many individuals. Specifically, if a member did not have insurance, Asana would obtain the member's information and then pretend to be the member to enroll. This procedure was spearheaded by admissions director AV and previous admissions director LG, under the direction of the Shandrows. AV, LG, and other admissions staff were the individuals that pretended to be the members during the enrollment process.

56.    In other situations, Asana's brokers would instruct potential patients what information they needed to provide to agents to get into the most desirable plans. For example, LG, and those under her direction, tracked down potential patient DD and told him what he needed to say he earned per year to get into the BCBSOK plan Asana preferred. DD ultimately enrolled in a plan and Asana started billing for his treatment almost immediately upon his plan becoming effective.

57.     Oftentimes, members had already started treatment before their insurance became effective. In these instances, Asana would simply delay documentation and billing so the dates of treatment appeared to be after the plan became effective.

58.     Notably, the enrollment dates for approximately fifty-three (53) of the members at-issue were less than seven (7) days from when their treatment commenced, indicating they were fraudulently enrolled for the specific purpose of receiving treatment at Asana.

59.     Similarly, approximately eighty-five (85) of the members at-issue were enrolled outside of open enrollment, which could only be done through a "qualifying event". Upon information and belief, many of the "qualifying events" used to justify a special enrollment period were false.

60.     The residency and/or identifications of the members at-issue were also falsified to claim active and ongoing Oklahoma residency. For approximately fifty-one (51) of the members at-issue, the patient's enrollment address, driver's address, and VOB address did not match.

61.     Lastly, a staggering two-hundred and fourteen (214) patients were enrolled by the same insurance agent. For reference, an insurance agent typically only enrolls a handful of members who will ultimately receive treatment at a certain facility.

62.     Using these tactics, Defendants were able to get individuals into desirable BCBSOK plans so Asana could immediately bill for treatment. The specific BCBSOK members involved in fraudulent enrollments are attached hereto as Exhibit A.

**III.     ASANA PAID KICKBACKS TO THE PATIENTS IN THE FORM OF FREE TREATMENT AND HOUSING**

63.     Defendants sought to, and did in fact, induce BCBSOK members to enroll in and continue attending their various treatment programs by offering

kickbacks in the form of, *inter alia*, free treatment, low-cost housing, food and/or transportation.

64.   As to ***free treatment***, Defendants waived the patients' "cost share," which refers to the amount a patient must pay out-of-pocket for a treatment. Combined with premium payments, cost-share helps to sensitize patients to the cost of the services they receive. By having some "skin in the game," patients are motivated to seek out the most cost-effective treatment and make the most of the treatment they do receive.

65.   As to ***free transportation and housing***, Defendants paid for patients' flights and food, and subsequently provided patients discharged from their detox program with free housing and other necessities of living. This was to induce patients to remain in Asana's outpatient treatment program after they were discharged from detox.

66.   For example, one patient (AW) was given free housing in an apartment in or around Huntington Beach while in outpatient treatment. However, when insurance declined to continue paying for such treatment, and she was unable to pay rent, she was kicked out. This demonstrates that housing was only a means for Asana to continue billing for treatment.

67.   Another patient (DD) was provided an apartment in Huntington Beach once he completed detox so long as he continued treatment at Asana. He did not pay anything for this apartment and was under the impression it was paid "by insurance."

68.   For patients that pushed back on continued stays, Asana tried to tempt them with special "420-friendly" houses, which combined free housing with cannabis or other drugs. For example, after member JH expressed his intention to seek treatment elsewhere, Asana unsuccessfully attempted to get him to stay by providing him drugs and "420-friendly" housing.

## IV.  WORST OF ALL, THE TREATMENT RENDERED WAS EITHER NON-EXISTENT, USELESS, AND/OR RENDERED BY UNQUALIFIED INDIVIDUALS

69.    The "treatment" that Asana received millions of dollars for was either non-existent or of such poor quality to be essentially useless. On many days, no treatment was provided at all. On others, the entire 'treatment' would be, at most, a thirty (30) minute group session where no actual treatment was provided, just a conversation amongst the patients without a practitioner (or periodic practitioner checks). Instead of appointments with licensed professionals, group sessions, detox checks, rounds, or other types of treatment, the patients received substandard, if any, treatment. Yet, the Defendants billed as if they were providing such services.

70.    Returning to the example of JC, Asana offered her one virtual session, medication dispensed from a fellow patient, and allowed her to go on a hike. And yet, Asana submitted claims seeking $4,500 in payments for every day of JC's stay, representing that they were providing 24-hour supervised detox treatment. This was obviously false.

71.    Similarly, during JH's stay, he was given "group" therapy and some virtual sessions. The "group" therapy entailed sitting in a circle smoking cigarettes while somebody spoke on a computer. For the virtual sessions, Asana staff logged him into sessions and then advised that he was free to do what he pleased so long as he remained logged in. Here again, Asana submitted bills to BCBSOK seeking $4,500 per day and representing that it provided legitimate detox treatment.

72.    It is well-settled that participation and personal observation in treatment are necessary for SUD treatment so that the practitioner can evaluate things like progress, health, and urges to use. As JC and JH's experiences indicate, the treatment that Asana billed for was either non-existent or failed to meet the definitions of the treatments being billed.

73.    Asana's real goal was to do the bare minimum to maximize profits while doing the minimum necessary to give the appearance of legitimate treatment.

74.    Indeed, executive director Jonathan Hagen instructed staff to doctor medical records to show attendance at treatments even if it was clear that an individual received no treatment because, for example, ***they were asleep***:



75.    Asana's medical director, Dr. Small, was equally bad. According to claim forms, he certified that all treatments were true and correct, and either carried out by him or under his supervision. In reality, Dr. Small did little but sign forms and pocket money so his license could be used to give the gloss of professional treatment.

76.    Asana's *modus operandi* is not only fraudulent, but life-threatening. This is especially so in the detox phase of treatment, where 24-hour supervision is required due to the heightened risk of withdrawal. On information and belief, at least one patient died shortly after enrolling in Asana's detox due to insufficient supervision.

77.    As noted above, the claims arising from the fraudulent scheme are attached hereto as Exhibit A. The patients whose claims arise from fraudulent

enrollments are attached hereto as Exhibit B. Both Exhibits A and B comprise reports pulled from the databases within BCBSOK that house this information. Exhibits C-E contain relevant extracts of exemplar claim documents (including payments) for three of the patients discussed (JH, JC, AW). Similar forms exist for each of the claims in Exhibits A and B, and the information on these forms can be found in the Exhibit A and B reports.

**<u>FIRST CAUSE OF ACTION</u>**

**Fraud and Fraudulent Concealment**

**(Against All Defendants)**

78.    BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

79.    Defendants knowingly made, or knowingly caused to be made, material misrepresentations to BCBSOK in enrollment applications and claim forms.

80.    In submitting claims, or causing claims to be submitted, Defendants represented to BCBSOK that: (i) Defendants complied with applicable laws, regulations, and procedures, (ii) the services billed were actually provided, medically necessary, and reimbursable, (iii) the information on the claim forms were true, accurate, and that material facts were not concealed, and (iv) those providing services were appropriately qualified and licensed.

81.    As set forth above, each of these representations was knowingly false because Defendants:

    a.  Paid kickbacks and engaged in false advertising to obtain patients;

    b.  Waived the cost-share members were responsible for under their plans;

    c.  Paid kickbacks to patients in the form of free housing and free treatment; and

    d.  Did not provide the services billed for at all or as billed for.

82.    The spreadsheet attached hereto as Exhibit A contain the specifics of each misrepresentation submitted by Defendants through Asana.

83. Defendants also made, or caused to be made, misrepresentations in enrollment forms. As stated herein, Defendants knew these representations were knowingly false because Defendants misrepresented or fraudulently concealed information regarding (i) the existence of qualifying events, (ii) residency and address information, and/or (iii) annual income. The claims in Exhibit B corresponding to the member IDs in Exhibit A are those resulting from enrollment fraud.

84. When making these false representations and material omissions, Defendants knew they were false. They made them to induce BCBSOK's reliance so that BCBSOK would issue payments based on materially inaccurate information.

85. BCBSOK reasonably relied on Defendants' false representations and material omissions because Defendants were legally obligated to submit accurate information and even certified they did so.

86. As a direct and proximate result of Defendants' misrepresentations and concealments, BCBSOK has been damaged by, among other things, paying claims that were not properly payable under BCBSOK's health benefit plans, applicable laws, and regulations, in an amount to be proven at trial.

87. Defendants' conduct constitutes malicious, oppressive, fraudulent, willful and wanton tortious behavior, in blatant and reckless disregard of BCBSOK's rights, for which BCBSOK should recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other persons similarly situated from engaging in similar conduct in the future.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants)

88. BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

89. Defendants negligently misrepresented to BCBSOK, or caused to be

negligently misrepresented to BCBSOK, that all services were provided in compliance with all laws and industry standards, were medically necessary, were compensable, and all material information had been disclosed.

90.    Defendants also negligently misrepresented to BCBSOK, or caused to be negligently misrepresented to BCBSOK, that all information they caused to be submitted on claim forms was true and accurate.

91.    BCBSOK reasonably relied on Defendants' false representations because Defendants were legally obligated to submit accurate information for valid claims and enrollment applications and disclose material information.

92.    As a direct and proximate result of BCBSOK's reasonable reliance and Defendants' misrepresentations and concealments, BCBSOK has been damaged by, among other things, paying claims that were not properly payable under health benefit plans, in an amount to be proven at trial.

93.    Defendants' conduct was wantonly negligent, and in blatant and reckless disregard of BCBSOK's rights. BCBSOK seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated from engaging in similar conduct.

## **THIRD CAUSE OF ACTION**

### **Intentional Interference with Economic/Contractual Relationships**
### **(Against All Defendants)**

94.    BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

95.    BCBSOK entered into health benefit plans with its members. Although Defendants fraudulently induced BCBSOK to enter into those contracts, their terms applied while they remained in effect. The contracts obligated BCBSOK's members to pay monthly premiums, deductibles, copays, or coinsurance for services that providers rendered to them. The contracts also required that BCBSOK be updated about material changes that might affect enrollment status.

96.    Defendants knew about BCBSOK's plans with its members and Defendants intentionally acted to interfere with the contracts by providing financial, housing, and other consideration to BCBSOK's members to induce them to treat with Defendants.

97.    By inducing and incentivizing BCBSOK's members to seek treatment with them, Defendants interfered with BCBSOK's plans with their members.

98.    Defendants' intentional interference with the economic relationship between BCBSOK and its members has directly and proximately caused BCBSOK to suffer monetary harm in an amount to be proven at trial.

99.    Defendants' conduct was malicious, oppressive, fraudulent, willful, and wantonly tortious, and in blatant and reckless disregard of BCBSOK's rights. BCBSOK seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated individuals and entities from engaging in similar conduct.

## FOURTH CAUSE OF ACTION

### Aiding & Abetting Tortious Conduct

### (Against All Defendants)

100.  BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

101.  Defendants had, at all relevant times, actual knowledge of each individual defendant's tortious conduct as discussed herein.

102.  Defendants understood that each individual defendant intended to defraud BCBSOK as set forth in this Complaint.

103.  Defendants nonetheless gave substantial assistance and encouragement to each individual defendant as discussed herein.

104.  Defendants' conduct was a substantial factor in bringing about BCBSOK's payment of the fraudulent claims.

105.  Defendants thus aided and abetted tortious conduct that damaged

COMPLAINT

BCBSOK.

# **FIFTH CAUSE OF ACTION**

## **Violations of Business and Professional Code Section 17200, *et seq*.**

### **(Against All Defendants)**

106.  BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

107.  Defendants violated California's Unfair Competition Law ("UCL") as set forth in Business and Professions Code §§ 17200 *et seq*. Under the UCL, unfair competition means any "unlawful, unfair or fraudulent business act or practice."

108.  As this Complaint sets forth, Defendants' business acts and practices are unlawful because they violate the following statutes: (i) The Anti-Kickback Statute, 18 U.S.C. § 1320; (ii) The Eliminating Kickbacks in Recovery Act, 18 U.S.C. § 220; (iii) the Health Care Fraud Statute, 18 U.S.C. § 1347; (iv) California's Insurance Anti-Kickback Law, Cal. Ins. Code §§ 750 *et seq*.; (v) California's Anti-Referral Law, Health & Safety Code § 445, (vii) California's Uniform Controlled Substances Act, Health & Safety Code § 11570, and False Advertising under Cal. Health & Safety Code § 11857.

109.  Defendants also used unfair fraudulent business practices to interfere with the central purpose of BCBSOK's business, thereby damaging BCBSOK to profit for themselves. Specifically, Defendants engaged in fraudulent scheme(s) and conduct in the form of enrollment fraud, body brokering, and unlawful kickbacks as set forth herein.

110.  As referenced above, Defendants took specific steps to hide their activities and evade detection.

111.  Defendants' unlawful, unfair, and fraudulent business acts and practices have directly and proximately caused BCBSOK to suffer monetary harm. BCBSOK seeks restitution for the harm in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Money Had and Received

### (Against All Defendants)

112.  BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

113.  In addition, or in the alternative, Defendants are liable for money had and received.

114.  As set forth herein, BCBSOK paid claims to Defendants.

115.  BCBSOK would not have paid the claims but for the wrongful conduct of Defendants as alleged herein.

116.  Defendants extracted the payments by withholding the truth of the conduct that was occurring.

117.  The amounts paid by BCBSOK should be returned to BCBSOK in good conscience.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment/Quantum Meruit/Restitution

### (Against All Defendants)

118.  BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

119.  BCBSOK conferred benefits on Defendants by paying Defendants for healthcare claims that were not reimbursable.

120.  Defendants have unjustly accepted and retained the benefit that BCBSOK conferred on them.

121.  Because it would be unjust and inequitable for Defendants to continue to retain the benefits that BCBSOK conferred on them, BCBSOK seeks the return of the money paid.

## **PRAYER FOR RELIEF**

WHEREFORE, BCBSOK, respectfully requests a judgment for BCBSOK and against Defendant, as follows:

A.    For actual, compensatory, and consequential damages in an amount to be proven at trial;

B.    An order obligating Defendants to disgorge all revenues and profits from their scheme;

C.    For treble, exemplary, and/or punitive damages;

D.    For pre- and post-judgment interest;

C.    For civil penalties to the extent the law permits;

D.    For other statutory remedies available to the extent the law permits;

E.    For injunctive relief barring Defendants from continuing its scheme and submitting claims to BCBSOK;

F.    For declaratory relief that any claims previously pending, currently pending, and that might be submitted by Defendants, or caused to be submitted by Defendants in the future, are not payable;

G.    For an award of costs of its suit to the extent the law permits.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial as to all matters so triable.

Dated: April 10, 2024

FOX ROTHSCHILD LLP

By: _/s/ John J. Shaeffer_
Benjamin McCoy (*phv forthcoming*)
John J. Shaeffer
10250 Constellation Avenue, Suite 900
Los Angeles, CA 90067
Tel: 610-397-7972
*Attorneys for Plaintiff*