DAVID D. PIPER (CASB No. 179889)
DPiper@Stradley.com
STRADLEY RONON STEVENS & YOUNG, LLP
1 World Trade Center, Suite 2575
Long Beach, CA 90831
Telephone: (562) 366-1653
Facsimile: (562) 366-1646

BENJAMIN H. MCCOY (Pro Hac Vice)
BMcCoy@Stradley.com
JORDANN R. CONABOY (Pro Hac Vice)
JConaboy@Stradley.com
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Telephone: (215) 564-8108
Facsimile: (215) 564-8120

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company,<br><br>Plaintiff,<br><br>v.<br><br>ASANA RECOVERY, INC., et al.,<br><br>Defendants. | Case No.: 8:25-cv-00735-DOC-DFM<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: September 28, 2026<br>Time: 8:30 a.m.<br>Place: Courtroom 10A<br>Judge: Hon. David O. Carter |

# TABLE OF CONTENTS


INTRODUCTION .......... 1

PROCEDURAL HISTORY .......... 2

BACKGROUND .......... 3

I. California SUD Facilities Must Have a Medical Director .......... 3

II. Dr. Small Operated a Sham Medical-Director Scheme .......... 3

a. Dr. Small Focused on Asana's Finances But Not Its Patients .......... 4

b. Dr. Small Sold His License to About 100 Other Facilities or More .......... 5

c. Dr. Small Illegally Directed Non-Physicians to Perform Functions Only a Physician Can Perform Under the Law .......... 6

d. Dr. Small Made $36 Million or More from His Scheme .......... 7

III. Defendants Drove Volume Through Body Brokering and Kickbacks .......... 7

a. Defendants Gave Patients Millions of Dollars in Free Housing .......... 8

b. Defendants Gave Patients Free Flights and Other Perks .......... 8

c. Defendants Waived Patients' Cost-Share .......... 9

IV. Brokered Patients Were Subject to Deficient and Illegal Treatment .......... 9

a. No Physician Was Responsible for Patients' Care .......... 10

b. Dr. Small Violated the Law on Physician Supervision and Direction .......... 11

V. Defendants Gave BCBSOK False Information and Records .......... 12

a. Defendants Falsely Said Dr. Small Provided Treatment .......... 12

b. Dr. Small Created False Records to Facilitate Fraudulent Bills .......... 13

VI. Defendants Submitted or Caused the Submission of Fraudulent Bills .......... 14

LEGAL STANDARD ........................................ 15
ARGUMENT ........................................ 16
I. The Court Should Treat the Scheme's Predicate Acts as Established and Limit Trial to Dr. Small's Responsibility and Damages ........................................ 16
II. Alternatively, BCBSOK Is Entitled to Partial Summary Judgment on Misrepresentations ........................................ 16
a. Defendants Misrepresented Charges ........................................ 17
b. Defendants Made Misrepresentations By Concealing Their Illegal Practices and Falsely Certifying Compliance ........................................ 18
c. Defendants Misrepresented Dr. Small as Members' Physician ........................................ 20
d. Defendants Made Misrepresentations by Creating False Medical Records ........................................ 21
CONCLUSION ........................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Bay Area Surgical Mgm't., LLC*,
2016 Cal. Super. LEXIS 161 (Cal. Super. Feb. 24, 2016) .................................. 17

*Brown v. Hain Celestial Grp., Inc.*,
No. 11-03082, 2015 WL 3398415 (N.D. Cal. May 26, 2015) ........................... 15

*Burch v. CertainTeed Corp.*,
34 Cal. App. 5th 341 (2019) ................................................................................ 19

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
No. 15-00865, 2018 U.S. Dist. LEXIS 173657
(C.D. Cal. Oct. 5, 2018) ....................................................................................... 18

*In re Out-of-Network Substance Use Disorder Claims*,
No. 19-2073, 2023 WL 2808747 (C.D. Cal Jan. 13, 2023) ............................... 17

*OCG Energy, LLC v. Jarvan Shen*,
No. 22-01568, 2024 WL 655990 (C.D. Cal. Jan. 16, 2024) .............................. 19

*Ochoa v. McDonald's Corp.*,
133 F. Supp. 3d 1228 (N.D. Cal. Sept. 24, 2015) ............................................. 16

*People ex rel. Monterey Mushrooms, Inc. v. Thompson*,
136 Cal. App. 4th 24 (Cal. Ct. App. 2006) ......................................................... 17

*People v. Paredes*,
61 Cal. App. 5th 858 (2021) ................................................................................ 16

*Randi W. v. Muroc Joint Unified Sch. Dist.*,
14 Cal. 4th 1066 (1997) ....................................................................................... 19

*Rightchoice Managed Care, Inc. v. Hosp. Partners, Inc.*,
109 F.4th 1054 (8th Cir. 2024) ............................................................................ 21

*SEC v. Johnson*,
No. 20-01493, 2022 WL 423492 (C.D. Cal. Jan. 26, 2022) ........................ 16, 18

*United States v. Crescendo Bioscience, Inc.*,
No. 16-02043, 2020 WL 2614959 (N.D. Cal. May 23, 2020) ...................... 17, 18

*United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747 (S.D.N.Y. 2015) .......... 8

*Valencia v. Merck & Co.*, No. 07-00388, 2009 WL 3365848 (E.D. Cal. Oct. 16, 2009) .......... 19

*United States ex rel. Mohamad v. Harper's Pharmacy Inc.*, No. 24-0348, 2025 WL 3724875 (C.D. Cal. Nov. 13, 2025) .......... 18

*United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395 (5th Cir. 2025) .......... 18

*Waldmann v. Fulp*, 259 F. Supp. 3d 579 (S.D. Tex. 2016) .......... 18

*Warner Constr. Corp. v. Los Angeles*, 2 Cal. 3d 285 (1970) .......... 19

*State ex rel. Wilson v. Superior Court*, 227 Cal. App. 4th 579 (Cal. Ct. App. 2014) .......... 17

**Statutes**

18 U.S.C. § 220 .......... 20

42 U.S.C. § 1320a-7b(b) .......... 20

Cal. Bus. & Prof. Code § 650 .......... 20

Cal. Code Regs. tit. 22 § 51000.24.4 .......... 3

Cal. Code Regs. tit. 22 § 51000.70 .......... 20

Cal. Code Regs. tit. 22, § 51341.1(28)(A) .......... 3, 6

Cal. Health & Safety Code § 11834.026 .......... 9, 11

Cal. Penal Code § 550 .......... 16, 19, 20

Plaintiff Blue Cross and Blue Shield of Oklahoma ("BCBSOK"), a Division of Health Care Service Corporation ("HCSC"), a Mutual Legal Reserve Company, submits this Brief in support of its Motion for Partial Summary Judgment against Defendant Christian R. Small, M.D. ("Dr. Small").

## INTRODUCTION

Fraud involving substance use disorder ("SUD") treatment facilities is rampant in Southern California, and it preys on the most vulnerable members of society—including people experiencing homelessness who fraudsters lure in with free housing, flights, meals, and other perks. These facilities need physicians to serve as medical directors in order to operate. A subset of doctors has weaponized that requirement, selling their licenses to give facilities an appearance of legitimacy and enable them to obtain the state's authorization to do business. Dr. Small is at the top of that list.

Dr. Small has been the medical director at over 100 facilities in multiple states. He conspired to submit or cause the submission of fraudulent claims for thousands of patients per month. He admits that such a sprawling operation has no close precedent anywhere in America. And the volume could not have been handled legitimately: Dr. Small's own medical-director contracts would have required him to work more than 24 hours every day.

The claim count demonstrates the scope of the scheme. While HCSC and BCBSOK members make up just a fraction of Dr. Small's patient base, they received claims for his purported services nearly every day for more than four years—often about 70 per day. That includes dozens of claims on holidays, as well as nearly 400 claims for about $1.4 million during a week when Dr. Small was on vacation. He deferred addressing a patient's death until after his trip, but the billing never stopped.

In total, HCSC and BCBSOK received more than $168 million in claims for Dr. Small's alleged services between 2022 and 2025. But it's beyond dispute that Dr. Small provided almost no patient care, if he provided any at all, so all the claims at issue contained lies about his involvement in the alleged services.

This Court already entered a Consent Judgment that resolves BCBSOK's claims against Asana Recovery and Dr. Small's other co-conspirators. While Dr. Small remains entitled to litigate his own liability, he should not be allowed to manufacture disputes over the misconduct underlying BCBSOK's claims. The only remaining issues, if any, concern the extent of Dr. Small's involvement in the unlawful scheme, whether he is legally responsible for the misconduct, and damages. The Court should therefore enter an order limiting trial to those issues.

Alternatively, if the Court concludes that broader issues concerning the scheme must remain for trial, it should at least grant partial summary judgment on the elements of BCBSOK's causes of action that can or must be proven by evidence of misrepresentations. The claims at issue contained at least four categories of misrepresentations: (a) undisclosed cost-share waivers that resulted in overstated charges; (b) false certifications of legal compliance despite widespread kickbacks and illegal operations; (c) false representations that Dr. Small was the patients' attending physician; and (d) fabricated medical records meant to support the claims.

Granting BCBSOK's motion will avoid an unnecessarily sprawling trial. Rather than relitigating the extensive record establishing the underlying misconduct and the falsity of the claims, the trial should focus on the only issues that remain: Dr. Small's responsibility for the misconduct and damages. That will save time, eliminate repetitive evidence, and spare the Court, the parties, and the jury needless work.

## PROCEDURAL HISTORY

On April 10, 2025, BCBSOK filed its Complaint against Dr. Small, as well as Asana Recovery and multiple individuals and entities affiliated with Asana (collectively, the "Asana Defendants"). Dkt. No. 1. BCBSOK and the Asana Defendants reached a settlement earlier this year, and on June 16, 2026, this Court entered a $7.5 million Consent Judgment against the Asana Defendants that also enjoins them from submitting claims to BCBSOK or its affiliates. Dkt. No. 94. Dr. Small—the linchpin of the conspiracy—is the only remaining Defendant.

## BACKGROUND

### I. California SUD Facilities Must Have a Medical Director

In California, a SUD treatment facility cannot operate without a licensed physician serving as its medical director. *See* Statement of Uncontroverted Facts ("SUF") ¶ 1; *see also* Cal. Code Regs. tit. 22 §§ 51000.24.4, 51000.70. By law, the medical director is "an agent of the substance use disorder clinic[.]" *id.* at 51000.70.

A medical director is responsible for "[e]nsur[ing] that medical care provided by physicians, registered nurse practitioners, and physician assistants meets the applicable standard of care[.]" *Id.* § 51341.1(28)(A). When it comes to billing, "there's shared responsibility [between the facility and the medical director] for ensuring accuracy of claims that pertain to [the medical director's] services or his team members' services." SUF ¶ 2. In sum, a medical director is in charge of "program oversight and is part of the [facility's] leadership team," SUF ¶ 3, and he is responsible for all aspects of the facility's operations, including billing, patient care, compliance, and policies. S*ee* Cal. Code Regs. tit. 22, § 51341.1(28)(A).

### II. Dr. Small Operated a Sham Medical-Director Scheme

SUD-related fraud in Southern California is pervasive—so much so that the legislature issued a declaration admonishing the type of practices at issue, "where unscrupulous services refer people with substance use disorders to programs that are inappropriate for their needs in order to gain access to insurance payments." 2018 Cal SB 1228 § 1(c); *see also* Rehab Riviera, Orange County Register ("At least part of Southern California's homeless boom seems to be fueled by the region's 1,100 rehab centers. Some woo out-of-state addicts with free, one-way trips, only to kick them to the streets after their insurance runs out[.]"). As the medical director at Asana and other facilities, Dr. Small was responsible for compliance and he had to perform his duties lawfully. SUF ¶ 4; Cal. Code Regs. tit. 22, § 51341.1(28)(A). But rather than combatting fraud, Dr. Small fueled it.

Seeking to capitalize on facilities' inability to function without a licensed

physician, Dr. Small sold them the right to list him as their medical director. SUF ¶¶ 1-5. But these were sham arrangements, as Dr. Small never even stepped foot in the facilities, SUF ¶ 6, and he failed to carry out the laundry list of duties that a medical director must perform. *See*, *e.g.*, SUF ¶¶ 7-8.

**a. <u>Dr. Small Focused on Asana's Finances But Not Its Patients</u>**

Asana is an example of Dr. Small's license-for-sale scheme. As Asana's CEO explained, the company depended on Dr. Small to exist and bill. SUF ¶ 9 ("Q. So without Dr. Small serving as Asana's medical director, Asana never submits any bills, correct? A. Correct."). So in exchange for Dr. Small accepting its medical directorship, Asana agreed to pay him a monthly fee, and it promised to give Dr. Small's company the exclusive right to bill for seeing Asana's patients. *See* SUF ¶ 10 ("Q. . . . [B]ecause Dr. Small served as Asana's medical director, no entity other than Headlands could provide medical services to Asana's patients, correct? A. That is correct, yes.").

Asana's CEO summed up Dr. Small's presence, stating "I don't think he's ever been to the program once." SUF ¶ 6. Asana's clinical director—a non-clinician who requires physician oversight—said he doesn't know that Dr. Small would even recognize him if they passed each other on the street. SUF ¶ 11. Like Asana's CEO, the clinical director also explained that he never saw Dr. Small at Asana or heard of him being there, SUF ¶ 12, and he never had a conversation with Dr. Small, SUF ¶ 13("Q. So you never in your life had a one-on-one conversation with Dr. Small? A. Not that I can recall."). Even Dr. Small's only expert admitted that "to [his] knowledge, there [are] very limited examples, if any of Dr. Small actually rendering the care." SUF ¶ 41.

Still, despite Dr. Small's hands-off approach when it came to Asana's patients, he maintained close financial ties with Asana's executives. Dr. Small acknowledged that, from a business perspective, he could exercise similar authority as Asana's CEO and its COO, and he was part of Asana's "leadership team." SUF ¶ 14. Dr. Small also

got hundreds of dollars for each patient who came to Asana, and he received at least $3,000 monthly for his "medical directorship." SUF ¶ 15. Between 2022 and 2025, Dr. Small received at least $738,950 from Asana. SUF ¶ 16.

**b. Dr. Small Sold His License to About 100 Other Facilities or More**

Dr. Small's scheme extended far beyond Asana. An expert in addiction medicine and medical directorships testified that serving even 15 or so other facilities would "not [be] safe." SUF ¶ 17. Dr. Small went many multiples beyond that and took it to a dangerous level that led to significant patient harm. *See*, *e.g.*, *Brunson v. Michael's House*, Civ. No. 24-4497, Dkt. No. 3 (Aug. 13, 2024) (allegations of an overdose death at a facility where Dr. Small was the alleged medical director).

In September 2022—the month of the alleged overdose at Michael's House—Dr. Small's company billed for more than 1,500 patients at more than 40 facilities. SUF ¶ 18. That's the case even though Dr. Small employed just two other physicians during that time. SUF ¶¶ 19-20. One (Dr. Eckman) worked at a single facility, SUF ¶ 21; the other (Dr. Brewer) had just begun temporary, part-time work and was not responsible for patients' overall care, SUF ¶¶ 20, 22. Thus, Dr. Small was the only physician who was allegedly responsible for the simultaneous care of more than 1,500 patients at more than 40 facilities. SUF ¶ 18.

The problems at facilities affiliated with Dr. Small were so widespread that he could not say how many of their patients died of overdoses. SUF ¶ 23. ("Q. "From 2020 to 2025, do you know how many people have died at treatment centers that you were the Medical Director at? A. I don't recall. I can't give you a number.").[1] In a similar vein, an employee reported a death to Dr. Small at the end of an email that gave more priority to first discussing protocols, wishing Dr. Small the "time of [his]

[1] Dr. Small couldn't recall the number of patient deaths even though he was testifying as his company's corporate representative and patient deaths and harm were topics in the Rule 30(b)(6) deposition notice.

life" on vacation, and stating that they could address the death after the trip. Declaration of Jordann R. Conaboy at ¶ 11, Ex. J. Still, during the week of that vacation, HCSC and BCBSOK received at least 383 claims for at least $1,396,757 for Dr. Small's alleged treatment of members housed at various facilities. SUF ¶ 24.

In total, Dr. Small was the nominal medical director of about 100 facilities in multiple states. SUF ¶ 25. He acknowledged that this figure is without any close precedent. SUF ¶ 26 ("Q. In the United States of America, are you aware of [] any physician who's a medical director at even close to the number of facilities where you've been the medical director? A. I'm not[.]").

Dr. Small's admissions and conduct also confirm that it is not feasible for a physician to legitimately serve as a medical director at so many facilities. Indeed, Dr. Small's own template contract required him to spend 15 hours per month on medical-director duties for each facility. *See*, *e.g.*, SUF ¶ 27. BCBSOK's expert also testified that at least 15 hours per month would be needed. *See*, *e.g.*, SUF ¶ 28. But Dr. Small could not meet that obligation at the number of facilities he purportedly served. SUF ¶ 29.

Take 2023, for example. That year, Dr. Small was the medical director at roughly 59 facilities or more, meaning that, at 15 hours per month, he would have had to fulfill the impossible task of working roughly 29.5 hours per day 7 days per week to meet his obligations. SUF ¶ 30. He nevertheless testified that he spent less than 10% of his working hours on medical-director duties. SUF ¶¶ 31-32.

**c. <u>Dr. Small Illegally Directed Non-Physicians to Perform Functions Only a Physician Can Perform Under the Law</u>**

Dr. Small was personally on Asana's licensing documents as Asana's medical director. SUF ¶ 33. Still, to the extent anyone acted as a purported "medical director," it was not Dr. Small but rather two non-physicians to whom Dr. Small allegedly "delegated" his responsibilities. SUF ¶ 34. Both Dr. Small and Asana's clinical director admitted as much, with the clinical director testifying that the alleged

"medical director" services performed by Dr. Small's company came in the form of meetings he had "once a month" with these two non-physicians. SUF ¶ 35.

Like the rest of Dr. Small's operations, that's a big problem. California law bars a medical director from delegating his responsibilities to a non-physician. Cal. Code Regs. tit. 22, § 51341.1(b)(28)(A)(ii). Thus, Dr. Small not only misrepresented himself as performing medical-director duties for 100 facilities or more, but he also illegally directed non-physicians to carry out jobs that only a physician can perform.

#### d. Dr. Small Made $36 Million or More from His Scheme

On paper, Dr. Small ran his license-for-hire scheme through a company called Headlands Addiction Treatment Services. Headlands is a "doing business as" name for Christian R. Small, M.D., a Professional Corporation. SUF ¶ 36. Dr. Small, in turn, is the sole owner and shareholder of the professional corporation. SUF ¶ 37. Thus, the financial benefits of the operation belong to Dr. Small.

And the money that flowed to Dr. Small from the scheme was significant. Between just 2022 and 2025—a fraction of the scheme's existence—Dr. Small received at least $35,983,941 from roughly 100 facilities. SUF ¶ 38. On top of that, Dr. Small also ran a separate business through which he allegedly saw patients two days per week. SUF ¶ 39. So Dr. Small's scheme effectively allowed him to bring in tens of millions of dollars for a part-time job with facilities that he never visited.

## III. Defendants Drove Volume Through Body Brokering and Kickbacks

Using Dr. Small's license, Defendants recruited people to Asana so they could bill BCBSOK and other health plans for tens of millions of dollars. They did so largely through a body-brokering and kickback scheme. Such schemes are built on kickbacks to marketers and patients, "who are often willing to participate in patient brokering, illegal kickbacks, and insurance fraud, in exchange for illicit benefits," including "free rent, transportation," cost-share waivers, and other perks. *See* Patient Brokering/Addiction Treatment Fraud, Hearing Before the House Energy and Commerce Committee at 45-48, 115th Congress (2017) (Testimony of Dave

Aronberg).

**a. <u>Defendants Gave Patients Millions of Dollars in Free Housing</u>**

To lure patients to participate in the scheme, Defendants promised them free housing in Southern California—a major draw for people from Oklahoma who were experiencing homelessness and otherwise struggling. Housing giveaways are a common kickback in healthcare. *See*, *e.g.*, *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 748-49 (S.D.N.Y. 2015) (facility paid kickbacks by providing below-market housing to people who attended its drug-treatment programs).

The housing kickbacks were extensive. That is clear from Asana's general ledgers, where Asana's CEO and COO both said evidence of rent payments would be if it exists. SUF ¶ 42. The ledgers show that Asana incurred costs of $3,346,749 for the housing where Defendants let patients live, but Asana collected only about 0.5% of that amount, or roughly $15,920. SUF ¶ 43. That's the equivalent of giving patients millions of dollars to get them under Defendants' control so Asana and Dr. Small could profit from them.

The kickback nature of the housing arrangements is established by Asana's ledgers, which recorded that patients owed a significant amount for rent but simultaneously wrote those obligations off. SUF ¶ 44. In other words, there was never any expectation of payment, and accounting records and invoices relating to rent were shams meant to mask Defendants' bribes.

**b. <u>Defendants Gave Patients Free Flights and Other Perks</u>**

Even before patients got to Asana, Defendants paid for their flights and transportation to get there, meaning that they were given all-expense-paid trips to Southern California in exchange for Defendants being able to bill their insurers. SUF ¶ 45. These transportation payments made up tens of thousands of dollars of more kickbacks. *Id.* Once patients arrived at Asana, in addition to free rent, they got expense-account access and free meals, as well as other perks like gift cards, at least some of which were given for referrals of more patients. SUF ¶ 46; *see also United*

*States v. Super*, Crim. No. 25-28, Dkt. Nos. 9 and 35 (E.D.N.C.) (imposing a 72-month sentence on a defendant who pleaded guilty to charges that she paid kickbacks by giving patients $50 to $60 gift cards for attending treatment and generating referrals).

**c. Defendants Waived Patients' Cost-Share**

Defendants knew patients were required to pay for part of their services under their health plans: they had patients sign documents acknowledging "copayments, deductibles, and co-insurance[.]" SUF ¶ 47. Two Asana executives testified that evidence of any cost-share payments would be in Asana's ledgers, SUF ¶ 42, but such evidence is absent. Asana's ledgers therefore confirm that Defendants systematically waived patients' cost-share obligations to incentivize them to let Defendants bill their plans. And those waivers were yet another form of kickbacks. Publication of OIG Special Fraud Alerts, 59 FR 65372-01.

## IV. Brokered Patients Were Subject to Deficient and Illegal Treatment

Since Asana is not a "licensed clinic or licensed health facility," its patients could receive only limited medical services that had to be rendered pursuant to strict standards either by a physician or under the supervision of a physician. *See*, *e.g.*, Cal. Health & Safety Code § 11834.026. To begin, while nurse practitioners ("NPs") and physician assistants ("PAs") could perform certain services, they were only allowed to do so under the "supervision and direction" of a physician. *Id.* § 11834.026(c).

During the relevant period, a physician could only provide supervision and direction to four NPs and PAs at a time, and Dr. Small had a written policy memorializing that law (even though he didn't follow it). SUF ¶ 48. Those limitations are meant to ensure compliance with the requirement that a physician is "always [] involved" in patients' care. SUF ¶ 49. Further, a physician must actively "monitor the resident to ensure" that the resident remains appropriate for services. Cal. Health & Safety Code § 11834.026(c)(5). As Asana's medical director, Dr. Small knew these requirements, SUF ¶ 50, but he violated them.

**a. <u>No Physician Was Responsible for Patients' Care</u>**

When it came to patient care, Dr. Small was nowhere to be found. And while Dr. Small and his expert have tried to suggest that some other physicians may have treated the relevant members and provided care and supervision to their NPs and PAs, the record shows that they did not.

Again, 2023 is a good example. For the first ten months of that year, Dr. Small was the nominal medical director of about 59 facilities or more, and he identified just three other physicians that he employed. But two of those physicians provided services exclusively at two facilities, and another testified that she was not responsible for patients' overall care. SUF ¶ 51. Thus, Dr. Small was the only physician who could even theoretically be available for the overall patient care of patients of Asana and nearly 60 other facilities. Such a pace is "hard to comprehend" and something that Dr. Small "could not have realistically satisfied[.]" Conaboy Dec. ¶ 15, Ex. N at 16; *see also id.* ¶ 16, Ex. O. It is therefore unsurprising that the head of Asana's clinical program testified that he is unaware of any patient ever seeing Dr. Small or being treated by him. SUF ¶ 52 ("Q. . . [Y]ou worked at Asana for two years and you don't remember one patient saying they personally met with Dr. Small? A. That is what I'm telling you yes.").

Rather than treating patients with physicians as billed, Dr. Small effectively set up a business built on the unauthorized practice of medicine by illegally allowing NPs and PAs to autonomously conduct and oversee all levels of care. Further, day-to-day care at Asana was provided by lower-level personnel who operated without physician oversight or control by Dr. Small despite his alleged role as medical director. SUF ¶ 53. Under this framework, "no physician [was] accountable for the medical care delivered to patients with substance use disorders[,]" which is clearly "a departure from the standard of care" and the law. Conaboy Dec. ¶ 15, Ex. O at 6. These failures led to significant safety issues and "recurring problems that adequate physician oversight exists to detect and correct." Conaboy Dec. ¶ 15, Ex. O at 23-24.

**b. <u>Dr. Small Violated the Law on Physician Supervision and Direction</u>**

The NPs and PAs who Dr. Small put in charge of patient care functioned without anything close to the level of physician supervision and direction required by California law. The record shows that Dr. Small and Dr. Jennifer Brewer were the only two physicians assigned to provide alleged supervision to NPs and PAs, and Dr. Small's policies and procedures were the same with respect to all the facilities. SUF ¶¶ 54-55; *see also* SUF ¶ 56 (Testimony of Dr. Small: "Q. Who was the primary supervisor for [] NPs and PAs? A. It's generally been me [Dr. Small]."). Thus, it was statistically impossible for Drs. Brewer and Small to meet the four-to-one limit. Dr. Brewer also admitted that she "certainly provided supervision and education to more than four nurse practitioners . . . [a]t a time." SUF ¶ 57.

Drs. Brewer and Small knew about the bar on a physician supervising more than four NPs, but Dr. Small inexplicably told Dr. Brewer that the law didn't apply to her. SUF ¶ 58. In fact, Dr. Brewer admitted that Dr. Small's setup disregarded California law altogether. SUF ¶ 59 ("Q. So your supervision and direction of NPs didn't even account for the laws of California; isn't that correct? A. That's correct.").

Under Headlands' policies, supervision was supposed to be documented on a specific form, SUF ¶ 60, but BCBSOK is unaware of any such documentation for Dr. Small or any physician other than Dr. Brewer, SUF ¶¶ 61. While Dr. Brewer testified that she kept contemporaneous notes when she met with an NP or PA, SUF ¶ 62, she also said Dr. Small didn't tell her about this lawsuit until recently and he never asked her to preserve any records, so she destroyed the notes, SUF ¶¶ 63.

Even setting aside all these other problems, Dr. Small and Dr. Brewer's alleged interactions with NPs and PAs fell far short of the required "supervision and direction[.]" Cal. Health & Safety Code § 11834.026(c). Those are "hands-on function[s] that require[] actual supervision and control" through "consultation, guidance, intervention when warranted, and evidence that the supervised duties are being properly performed[,]" but nothing of the sort happened here. SUF ¶ 64.

At most, Dr. Brewer had 30-minute calls with NPs and PAs every few weeks or once a month, but she admitted that (a) she had no familiarity with their patients, and (b) the calls often involved no discussion of the NPs and PAs' treatment of patients. SUF ¶ 65. Further, the NPs and PAs were free to skip these 30-minute calls with Dr. Brewer, and when that happened, the NPs and PAs would go a month or more without even interacting with her. SUF ¶ 66.

## V. <u>Defendants Gave BCBSOK False Information and Records</u>

### a. <u>Defendants Falsely Said Dr. Small Provided Treatment</u>

Despite Dr. Small's detachment from the services at issue, Defendants contacted BCBSOK to induce payment by falsely claiming that Dr. Small treated the patients and provided the services at issue. Those lies were vital to the scheme. As a BCBSOK representative explained, "a request can't even be put in [BCBSOK's] system without key pieces of information that [BCBSOK] call[s] minimum necessary clinical information[,]" including "the name of the attending physician." SUF ¶ 67. Thus, just as Dr. Small's sale of his license permitted Asana to operate, so too did it allow Defendants to bill BCBSOK under false pretenses.

Dr. Small kept up the ruse about allegedly being members' physician even after BCBSOK sent him letters memorializing Defendants' misrepresentations and advising that BCBSOK was relying on the information they provided, SUF ¶ 68:

BlueCross BlueShield of Illinois
PO Box 805107
Chicago, IL 60680-0657

February 22, 2022

**This letter is a courtesy copy for your records.**

Have questions about this letter?
Contact us at the number on your Member ID card.

CHRISTIAN SMALL
[redacted] CA [redacted]

| | | | |
|---|---|---|---|
| Effective Date | [redacted]2022 | Expiration Date | [redacted]/2022 |
| Total Days / Units Approved | 7 | | |
| Subscriber ID | [redacted] | Treatment Setting | Inpatient Rehab |
| Member | [redacted] | Physician | CHRISTIAN SMALL |
| Date of Birth | [redacted] | Facility/Provider | ASANA RECOVERY INC |

### b. Dr. Small Created False Records to Facilitate Fraudulent Bills

To further the scheme, Dr. Small also created or caused the creation of false medical records—many of which were submitted to BCBSOK to support claims for payment. For example, the relevant BCBSOK members' files falsely identify Dr. Small as their "attending physician" and "primary physician[.]" SUF ¶ 69. Consistent with the parties' experts, Dr. Brewer testified that these terms mean the physician who was "on the case" and who became "familiar with the patient throughout the patient's stay." SUF ¶ 70. But Dr. Small played neither of those roles, so his designations in the members' files were false.

The files also contained forms patients signed stating that they were "under the care of their attending physician[,]" who was identified as Dr. Small—another falsity. SUF ¶ 71. In addition, the medical records are supposed to be tailored to specific patients, but they contained "[v]erbatim repetition of the 'individualized' portion of [] clinical note[s] across multiple" patients, which "undermines the reliability of the record as evidence that the documented services were described as rendered." SUF ¶¶ 72-73 (quoting page 23 of Dr. Danovitch's rebuttal report). Signatures are also "backdated[,]" and the records are "unreliable and fabricated." SUF ¶¶ 72-73 (quoting page 16 of Dr. Danovitch's rebuttal report).

In addition, Dr. Small had non-clinicians affix medical records with his "co-signature," which constitutes a physician's "endorsement of the care that a patient is receiving," as well as a representation that the physician has "knowledge [and] familiarity" with the patient and "support for a care plan based on. . . the patient's presentation." SUF ¶ 74. Asana's CEO acknowledged that Dr. Small's "fraudulent signature[s]" were submitted to BCBSOK. SUF ¶ 75.

Dr. Small also admitted that non-clinicians regularly signed his name on notes without him conducting any review or performing any treatment. SUF ¶ 76; *see also* SUF ¶ 77 ("Q. Every note that they put your co-signature on, did you review that note? A. No. . . . Q. Okay, so they could put your signature on notes even without you having reviewed the note? A. Yes."). Thus, the forged co-signatures were misleading on their face. And Dr. Small admitted that records like the one below did not indicate whether someone signed his signature without his review, SUF ¶¶ 78-79:


Reviewed by

Christian Small, Medical Director, MD Lic # (Review), NPI Number 1740546209, 06/06/2023 12:07 PM

## VI. <u>Defendants Submitted or Caused the Submission of Fraudulent Bills</u>

To capitalize on their improper and illegal practices, Defendants flooded BCBSOK with claims that masked their fraud. For the Asana portion of the scheme alone, Defendants' claims caused BCBSOK to pay roughly $9.5 million, about $9.2 million of which was for claims on which Dr. Small was identified as the attending provider. SUF ¶ 80.

While those claims were transmitted by a third-party billing company, they were submitted on behalf of both Asana and Dr. Small, as Dr. Small "assigned to Asana Headlands' ability to bill for Headlands services provided to Asana patients[.]" SUF ¶ 81; *see also* SUF ¶ 82 (Testimony of Asana CEO Mark Shandrow: "Q. . . . Asana, when it billed insurance companies, was billing on behalf of Dr. Small and Headlands; was it not? . . . A. Correct."). The claims were based directly on the medical records prepared by Dr. Small and his company, meaning that Dr. Small and his company caused the submission of the false claims. SUF ¶ 83 (Testimony of Asana CEO Mark Shandrow: "Q. And in fact, the bills that Asana submitted to [BCBSOK] and other payors were based on the medical records that Dr. Small and Headlands prepared; weren't they? A. Yes, absolutely[.] . . . Q. So Headlands, by preparing the medical records, caused Asana's bills to be submitted to Blue Cross Blue Shield of

Oklahoma; did they not? A. Correct.”).

Including Asana and other facilities, Dr. Small’s scheme resulted in the submission of bills to health plans insured or administered by HCSC—BCBSOK’s parent—for over $168 million for claims on which Dr. Small was listed as the attending provider. SUF ¶ 84. That’s a staggering figure considering that HCSC and BCBSOK members likely make up just a fraction of Dr. Small and his co-conspirators’ billings, especially since Dr. Small’s operations are based in California whereas HCSC and BCBSOK are not.

To put that in perspective, Dr. Small submitted or caused the submission of claims for HCSC/BCBSOK members “on almost every consecutive calendar day between February 1, 2020 and April 6, 2025.” SUF ¶ 85. On many days, Dr. Small submitted or caused the submission of claims for upwards of 70 patients with HCSC/BCBSOK coverage alone—not including the many other claims he likely submitted for patients with other coverage. SUF ¶ 86.

## LEGAL STANDARD

Rule 56(a) provides for “partial summary judgment”—a mechanism to streamline a case and reduce the length of trial as well as simplify the issues for the trier of fact. Fed. R. Civ. P. 56(a); *see also* Fed. R. Civ. P. 56 (Notes on Rules—2010 Amendment, Subd. (a)) (partial summary judgment is available for “part of a claim or defense.”). Thus, “[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.” Fed. R. Civ. P. 56(a); *see also Brown v. Hain Celestial Grp., Inc.*, No. 11-03082, 2015 WL 3398415, at *3 (N.D. Cal. May 26, 2015). Courts utilize partial summary judgment, “when warranted, [to] selectively fillet a claim or defense[.]” *Ochoa v. McDonald’s Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. Sept. 24, 2015); *see also SEC v. Johnson*, No. 20-01493, 2022 WL 423492, at *8 (C.D. Cal. Jan. 26, 2022) (“treat[ing] as established the facts supporting the material misrepresentation[.]”).

## ARGUMENT

### I. The Court Should Treat the Scheme's Predicate Acts as Established and Limit Trial to Dr. Small's Responsibility and Damages

The Consent Judgment resolves BCBSOK's claims against Asana Recovery and Dr. Small's other co-conspirators with respect to the causes of action that remain against Dr. Small. While the Consent Judgment does not alone establish Dr. Small's liability, when taken together with the rest of the evidence, it confirms that the underlying misconduct and the falsity of the claims are beyond genuine dispute. The Court should therefore treat the factual predicates for the causes of action as established and limit trial to Dr. Small's role in the scheme, his responsibility for the resulting misconduct, and damages. *See* Fed. R. Civ. P. 56(g).

### II. Alternatively, BCBSOK Is Entitled to Partial Summary Judgment on Misrepresentations

If the Court finds that the trial should proceed on issues other than Dr. Small's liability for the misconduct and damages, it should still grant partial summary judgment on the elements of BCBSOK's causes of action that can or must be proven by evidence of misrepresentations.[2]

Defendants represented their claims as true, accurate, and legally compliant. California law also prohibits providers from falsely presenting or concealing information relating to an insurance claim, including by misrepresenting charges, Cal. Penal Code § 550(b), falsely claiming that services were eligible for payment, *id.*, or "by concealing that kickbacks had been paid for [] referrals when billing insurance companies[,]" *People v. Paredes*, 61 Cal. App. 5th 858, 866 (2021). There is no

[2] The relevant causes of action are fraud and fraudulent concealment (Count 1); negligent misrepresentation (Count 2); aiding and abetting tortious conduct (Count 4); UCL (Count 5); money had/received (Count 6); and unjust enrichment/quantum meruit/restitution (Count 7).

material dispute that Defendants did all those things, in addition to lying other ways.[3]

**a. <u>Defendants Misrepresented Charges</u>**

As is common for health plans, BCBSOK members were responsible for co-pays, co-insurance, or deductibles (collectively, "Cost Share"). *See*, *e.g.*, *United States v. Crescendo Bioscience, Inc.*, No. 16-02043, 2020 WL 2614959, at *3 (N.D. Cal. May 23, 2020). But Defendants systematically waived BCBSOK members' Cost Share while also providing other kickbacks. SUF ¶¶ 42-47; *see also* Background § III(c). These waivers served as an inducement for BCBSOK members to come to Asana, and they resulted in at least two misrepresentations on the claims: (a) misrepresentations about charges; and (b) misrepresentations that the underlying services were not tainted by kickbacks. Each supports partial summary judgment.

Electronic claim forms require facilities to identify the "total amount [of] charges" for their services, which necessarily includes charges to both members and health plans. *See*, *e.g.*, *Aetna Life Ins. Co. v. Bay Area Surgical Mgm't., LLC*, 2016 Cal. Super. LEXIS 161, at *7-9 (Cal. Super. Feb. 24, 2016). Thus, when a facility fails to disclose that it waived a patient's Cost Share, it misrepresents its charges. *See*, *e.g.*, *In re Out-of-Network Substance Use Disorder Claims*, No. 19-2073, 2023 WL 2808747, at *32 (C.D. Cal Jan. 13, 2023). And there is no genuine dispute that such misrepresentations happened here. SUF ¶¶ 42-47; *see also* Background § III(c).

---

[3] Dr. Small argues that he is not liable for the fraud at issue because he didn't personally hit send on the claim submissions to BCBSOK. He is wrong. California law imposes liability on those who cause the submission of fraudulent claims, as well as those who are an "active part of [a] conspiracy enabling" the submission of fraudulent health care claims. *People ex rel. Monterey Mushrooms, Inc. v. Thompson*, 136 Cal. App. 4th 24, 36-37 (Cal. Ct. App. 2006); *see also State ex rel. Wilson v. Superior Court*, 227 Cal. App. 4th 579, 605-06 (Cal. Ct. App. 2014). Plus, Dr. Small faces liability for BCBSOK's causes of action other than fraud. But the Court need not decide causation or liability now. The only issue before the Court with respect to BCBSOK's alternative request for relief is whether the relevant claims contained misrepresentations, and there's no material dispute that they did.

Defendants' systematic Cost-Share waivers also represent undisclosed kickbacks to BCBSOK members, as such waivers served to "induc[e] [members] to use or continue to use Defendants' services." *United States ex rel. Mohamad v. Harper's Pharmacy Inc.*, No. 24-0348, 2025 WL 3724875, at *4 (C.D. Cal. Nov. 13, 2025) (quotation omitted); *see also Crescendo Biosci., Inc.*, 2020 WL 2614959, at *5. Their scheme was particularly brazen because they knew it was illegal and tried to cover it up by having members sign forms acknowledging that they were responsible for "copayments, deductibles, and co-insurance." SUF ¶ 47; *see also Crescendo Bioscience*, 2020 WL 2614959, at *11. The Court should therefore treat the charge and Cost-Share kickback misrepresentations as established. *See*, *e.g.*, *Johnson*, 2022 WL 423492, at *8; *Hsingching Hsu v. Puma Biotechnology, Inc.*, No. 15-00865, 2018 U.S. Dist. LEXIS 173657, at *37 (C.D. Cal. Oct. 5, 2018).

**b. Defendants Made Misrepresentations By Concealing Their Illegal Practices and Falsely Certifying Compliance**

Defendants submitted claims to BCBSOK using a standard CMS form known as the "UB-04/CMS 1452 Institutional Billing Form," or its "electronic counterpart, the 837I institutional form." SUF ¶ 87. Each submission "certifies, among other things, that the information on the form is true, accurate, and complete and that the claim complies with applicable law and instructions." *See*, *e.g.*, *United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 400 (5th Cir. 2025); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 593-94 (S.D. Tex. 2016) (a UB-04, otherwise known as a "CMS-1450[,]" and "its electronic equivalent[,]" contain a "representation that 'the billing information as shown on the 'face hereof is true, accurate, and complete' and 'that the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.") (alterations omitted; emphasis added).

Dr. Small admitted that his company certifies compliance with all applicable laws each time it submits a claim for payment:

Q. When Headlands was submitting claims to insurers, is it your

understanding that you were certifying that the services provided were done in compliance with applicable laws?

A. Yes.

SUF ¶ 88.

California common law and statutes also separately memorialize the substance of the certifications by requiring truthful and non-misleading claims for payment. *See* Cal. Penal Code § 550; *see also*, *e.g.*, *OCG Energy, LLC v. Jarvan Shen*, No. 22-01568, 2024 WL 655990, at *11 (C.D. Cal. Jan. 16, 2024) (a defendant has a duty to disclose "when the defendant had exclusive knowledge of material facts[,] [and] when the defendant actively conceals a material fact from the plaintiff[.]") (quoting *Burch v. CertainTeed Corp.*, 34 Cal. App. 5th 341, 349 (2019)); *Valencia v. Merck & Co.*, No. 07-00388, 2009 WL 3365848, at *3 (E.D. Cal. Oct. 16, 2009) (claims for nondisclosure arise when, as here, "the defendant makes representations but does not disclos[e] facts which materially qualify the facts disclosed, or which render disclosure likely to mislead[.]") (quoting *Warner Constr. Corp. v. Los Angeles*, 2 Cal. 3d 285, 294 (1970)). And California law provides that a "misleading half-truth" is an "actionable misrepresentation rather than mere nondisclosure." *Randi W. v. Muroc Joint Unified Sch. Dist.*, 14 Cal. 4th 1066, 1073 (1997).

Here, there is no material dispute that Defendants' certifications and the substance of their claims to BCBSOK constituted misrepresentations:

- **<u>Housing, Transportation, and Gift-Card Kickbacks</u>**: Defendants submitted or caused the submission of claims tainted by undisclosed kickbacks, including expense-account access, free housing and meals, transportation, gift cards, and the Cost-Share waivers discussed above. *See* Background § III. By doing so, they misrepresented the services as having been performed for strictly medical reasons, and they misrepresented compliance with multiple federal and state laws precluding kickbacks. *See*, *e.g.*, Cal. Penal

Code § 550(b) (barring insurance claims that contain misrepresentations or conceal kickbacks); Cal. Bus. & Prof. Code § 650 (California's anti-kickback law); 18 U.S.C. § 220 (Eliminating Kickbacks in Recovery Act); and 42 U.S.C. § 1320a-7b(b) (the federal Anti-Kickback Statute).

- **Medical Director Non-Compliance:** Defendants misrepresented that Dr. Small and Asana complied with California's medical-director laws, which Dr. Small violated by operating under a phantom medical-director arrangement and by delegating his medical-director responsibilities to non-physicians. *See* Background § II(b)-(c); *see also*, *e.g.*, Cal. Code Regs. tit. 22 §§ 51000.24.4, 51000.70, 51341.1(28)(A).
- **Physician Supervision and Direction Non-Compliance:** The admissible evidence shows that Dr. Brewer exceeded the statutory limit and destroyed her notes after Dr. Small failed to request preservation, and that Dr. Small likewise blew past the limit or provided no supervision and direction at all. SUF ¶¶ 57, 58, 62-66. That likewise renders the certifications false.

**c. Defendants Misrepresented Dr. Small as Members' Physician**

Over 99% of the claims at issue identified Dr. Small as the attending provider—accounting for roughly $9.2 million of the $9.5 million that Defendants improperly caused BCBSOK to pay Asana. SUF ¶ 80. Defendants also falsely told BCBSOK that the members would be treated by Dr. Small, but they instead received services—if at all—from non-physicians operating without the required supervision and direction. SUF ¶¶ 67-68; *see also* Background § V(a).

Other than Dr. Small's admittedly forged signatures on members' medical records—which neither the Court nor a jury can rely on—there is no admissible evidence or expert testimony that Dr. Small treated a single patient, much less that he

did so in compliance with the applicable law and standards. *See*, *e.g.*, SUF ¶ 76 (Dr. Small's admission that the "[p]rocess for [c]ountersign[ing]" his name on patients' notes was for non-clinicians to "upload note[s] under [Dr. Small's] name . . . then sign the note for [Dr. Small][,]" and that they followed this practice for notes that Dr. Small never reviewed and patients he never saw). To the contrary, the record shows that Defendants misrepresented that Dr. Small provided the services at issue when he did not. SUF ¶ 41. That is classic fraud, and it infects all the relevant claims. *See*, *e.g.*, *Rightchoice Managed Care, Inc. v. Hosp. Partners, Inc.*, 109 F.4th 1054, 1058 n.2 (8th Cir. 2024) (upholding fraud verdict where a provider "submitted [bills] under the identifier of one provider for work that is done by a different provider.").

**d. <u>Defendants Made Misrepresentations by Creating False Medical Records</u>**

Defendants' submissions to BCBSOK also contained misrepresentations because they included or were based on false medical records. For example, the records contained Dr. Small's forged signature and falsely conveyed that he had reviewed the records and provided treatment to the underlying patient when he did not do so. SUF ¶¶ 76-79. Even Asana's CEO admitted that these forged signatures were fraudulent, that Dr. Small caused the fraudulent signatures to be submitted to BCBSOK, and that the signatures formed the basis of the claims at issue. SUF ¶¶ 75, 83. Thus, there is no material dispute about any of those issues. The records also falsely identified Dr. Small as each patient's "attending physician" and "primary physician," which he was not. SUF ¶¶ 69.

## CONCLUSION

The Court should streamline the trial and grant partial summary judgment in favor of BCBSOK.

Respectfully submitted,

Dated: August 31, 2026

STRADLEY RONON STEVENS & YOUNG, LLP

*<u>/s/ Benjamin H. McCoy</u>*

Benjamin H. McCoy (Pro Hac Vice)
bmccoy@stradley.com
Jordann R. Conaboy (Pro Hac Vice)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Benjamin H. McCoy, counsel of record for BCBSOK, certify that, on August 31, 2026, I caused service of the foregoing on all counsel of record through the Court's electronic filing system.

Dated: August 31, 2026

STRADLEY RONON STEVENS & YOUNG, LLP

*/s/ Benjamin H. McCoy*

Benjamin H. McCoy (Pro Hac Vice)
bmccoy@stradley.com
Jordann R. Conaboy (Pro Hac Vice)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiff*

## CONFERENCE OF COUNSEL

This motion is made following a conference of counsel pursuant to L.R. 7-3, which took place by telephone on August 24, 2026. My co-counsel, Jordann Conaboy, joined me during the August 24 meet and confer, with attorneys Kyle Nageotte and Jake Sesti representing Dr. Small. *See* Declaration of Jordann R. Conaboy at ¶ 22.

Dated: August 31, 2026

STRADLEY RONON STEVENS & YOUNG, LLP

*/s/ Benjamin H. McCoy*

Benjamin H. McCoy (Pro Hac Vice)
bmccoy@stradley.com
Jordann R. Conaboy (Pro Hac Vice)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiff*

**CERTIFICATE OF WORD COUNT**

I, Benjamin H. McCoy, counsel of record for BCBSOK, certify that this brief contains 6,881 words, which complies with L.R. 11-6.1. The brief is also fewer than 25 pages, which complies with the page limit set forth in Judge Carter's Procedures.

Dated: August 31, 2026

STRADLEY RONON STEVENS & YOUNG, LLP

*/s/ Benjamin H. McCoy*

Benjamin H. McCoy (Pro Hac Vice)
bmccoy@stradley.com
Jordann R. Conaboy (Pro Hac Vice)
jconaboy@stradley.com
David D. Piper
dpiper@stradley.com

*Attorneys for Plaintiff*