# EXHIBIT A

ROUGH DRAFT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, a division of HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company,<br><br>Plaintiff,<br><br>v.<br><br>ASANA RECOVERY, INC., BEACHFRONT SOBER LIVING, INC., ASANA BUY SELL LLC, MARK SHANDROW, ADAM SHANDROW, JONATHAN HAGEN, CHRISTIAN SMALL, M.D., JOHN DOES 1-50, AND ABC CORPS, 1-50,<br><br>Defendants. | Case No. 25-cv-00735-DOC-DFM |

VIDEOTAPED DEPOSITION OF

MARK SHANDROW

AUGUST 19, 2026

Reported by: Miranda Menestrina, CSR No. 14926



ROUGH DRAFT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, a division of HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 25-cv-00735-DOC-DFM |
| ASANA RECOVERY, INC., BEACHFRONT SOBER LIVING, INC., ASANA BUY SELL LLC, MARK SHANDROW, ADAM SHANDROW, JONATHAN HAGEN, CHRISTIAN SMALL, M.D., JOHN DOES 1-50, AND ABC CORPS, 1-50, | ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION OF

MARK SHANDROW

taken by the attorney for Defendant, Christian Small, M.D., commencing at the hour of 10:03 a.m., on Wednesday, August 19th, 2026, before Miranda Menestrina, Certified Shorthand Reporter No. 14926, in and for the State of California.





APPEARANCES:

For the Plaintiff, Blue Cross and Blue Shield of Oklahoma

STRADLEY RONON STEVENS AND YOUNG, LLP
BY: JORDANN R. CONABOY
2005 Market Street
Suite 2600
Philadelphia, Pennsylvania 19103
(T) 215.564.8108
(F) 215.564.8120
jconaboy@stradley.com

For the Defendant, Christian Small, M.D.

HIGGS FLETCHER & MACK LLP
BY: JAKE D. SESTI
401 West A Street
Suite 2600
San Diego, California 92101-7910
(T) 619.236.1551
(F) 619.696.1410
sestij@higgslaw.com

A. No, absolutely not.
Q. Did you ever make any personal payments to Headlands for services other than those performed by Headlands under this contract?
A. No, I did not.
Q. Did you ever make any payments, personally, to Dr. Small for services -- for any services other than those performed under this contract by Headlands?
A. No, I did not.
Q. Are you aware of anyone at Asana making payments to anyone at Headlands, other than for services Headlands performed under this contract?
A. No, I am not.
Q. Are you aware of anyone at Asana making any payments to Dr. Small, personally, other than for services Headlands performed under this contract?
A. No, I am not.
Q. To the best of your knowledge, has Asana complied with the obligations under this contract?
A. Asana? Yes, we have.
Q. Do you believe that Headlands has breached any obligations under this contract?

A. Yes, I do.
Q. And which paragraph in this contract do you believe Asana has violated, I'm sorry, Headlands has violated?
A. Which paragraph? The main one is involvement in hiring. I read this yesterday. Let me see. Give me one moment. Let me see. I think it's addendums.
Page 24, paragraph 1. I don't believe Dr. Small provided 15 hours per month of services to Asana Recovery.
Q. And where in this contract does it require Dr. Small, personally, to provide 15 hours per month to Asana?
A. It says "medical director," and he was our medical director.
Q. Do you believe that the medical director was Dr. Small in his individual capacity, not Headlands?
A. Dr. Small is on all of our licensing as our medical director, not Headlands.
Q. Was Dr. Small involved in preparing Asana's licensing?
A. No, Dr. Small was not involved in preparing our licensing.
Q. Did you ever send Asana's licensing to

Q. And I appreciate the clarification. You are here in your individual capacity and as the corporate representative for Asana. So I will do my best, when applicable, to make sure the question is clear, whether I'm asking you for your independent, personal knowledge, or you as the corporate representative for the company.
Does that make sense?
A. That would be helpful, thank you.
Q. So I'll repeat my question.
Were you personally satisfied with Headlands' medical director services between 2022 and 2023?
A. Me, personally, yes.
Q. Do you know if Asana was satisfied with Headlands' medical director services between 2022 to 2023?





A. Obviously there were glitches here and there that were corrected and addressed, but I would say yes.
Q. At any point in time were you dissatisfied with Headlands medical director services?
A. Me? No.
Q. Do you believe that Dr. Small was required to

personally see every single patient who received treatment at Headlands --Asana?

A. Me personally? I did not. I assumed he didn't because he didn't. He never came -- I don't think he's ever been to the program once.

Q. And I'm not asking if you believe -- I'm asking do you believe he was required to personally see every single patient at Asana?

A. Do I believe he was -- no. I mean, wait, sorry, let me correct that.

Can you say that question one more time, please?

Q. Yes. Do you believe Dr. Small was required to personally see every single patient at Asana?

MR. MCLEOD: Objection. Before that answer, are you asking under contractual requirements, or are you asking for Mr. Shandrow to opine about legal requirements, separate from the contract?

MR. SESTI: In no way in this deposition am I



asking Mr. Shandrow to form a legal opinion. So I'm asking him based on his experience and the CEO of

Q. And during the relevant time periods, from between 2020 to 2025, Asana treated patients who were insured by other Blue Cross entities, correct?

A. Yes, correct.

Q. Have any of those other Blue Cross entities ever accused Asana of not providing treatment to their patients?

A. No.

Q. So let me put it differently. The only insurance company over the last five years who has ever accused Asana of wrongdoing is Blue Cross and Blue Shield of Oklahoma?

A. Correct. For our entire existence.

MR. SESTI: Okay. I don't have any further questions for you at this time.

I reserve my right to continue the deposition or take it later given, I believe, Asana produced something like 200,000 pages of documents within the last week or so that we have not completed our review on.

Thank you, Mr. Shandrow.

THE WITNESS: Thank you.

MR. MCLEOD: Jordann, you may be on mute still.

MR. CONABOY: Hi, Mr. Shandrow. I'm Jordann

Conaboy. I represent the plaintiff, and I'm going to have a few questions for you.

THE WITNESS: Thank you. Nice to meet you.

MR. CONABOY: Nice to meet as well.

EXAMINATION

BY MR. CONABOY:

Q. In order for Asana to operate, you needed a medical director, right?

A. Yes, absolutely.

Q. So Asana could not function without a medical director under the law?

A. Under -- yes. Multiple laws and contracts.

Q. And you also couldn't bill -- Asana could not bill without a medical director, right?

A. Absolutely not.

Q. And Dr. Small was the medical director.

MR. SESTI: Objection. Misstates the evidence, misstates the facts.

BY MR. CONABOY:

Q. For Dr. Small was Asana's medical director, correct?

A. Yes, Dr. Small was our medical director.

Q. Between 2020 and 2025 no other physician, other than Dr. Small, served as Asana's medical director, right?



MR. SESTI: Same objection.
THE WITNESS: Sorry. That is correct.
BY MR. CONABOY:
Q. And Asana needed a medical director in order to bill Blue Cross Blue Shield of Oklahoma; isn't that correct?
A. Yes, that's correct.
Q. So without Dr. Small serving as Asana's medical director, Asana never submits any bills, correct?
MR. SESTI: Objection. Misstates the evidence.
THE WITNESS: Correct.
BY MR. CONABOY:
Q. Okay. Now, Asana had a contract with Dr. Small's company, Headlands, correct?
A. That's correct, yes.
Q. And it was pursuant to that contract that Dr. Small served as Headlands's medical director?
A. Headlands's medical director?

Q. I'm sorry. It was pursuant to the contract between Asana and Headlands that Dr. Small served as Asana's medical director, correct?

A. That's correct.

Q. And that contract provided for two types of services, right? First, Headlands provided medical treatment to Asana's patients, right?



A. Yes.

Q. And then second, Dr. Small served as Asana's medical director, correct?

A. That is correct, yes.

Q. And part of the deal was that Dr. Small would get the exclusive right to provide medical services to Asana's patients, correct?

A. I apologize. Could you repeat that question?

Q. Part of the deal in the contract between Asana and Headlands was that Headlands would get the exclusive right to provide medical services to Asana's patients, correct?

A. That is correct.

Q. In other words, because Dr. Small served as

Asana's medical director, no entity other than Headlands could provide medical services to Asana's patients, correct?

A. That is correct, yes.

MR. CONABOY: Jake, could you remind me of what exhibit number the Headlands contract was, Headlands/Asana contract?

MR. SESTI: I believe it was 2.

MR. CONABOY: Okay. I'm going to share my -- well, I'll share my screen of Exhibit 2, which is already submitted.





BY MR. CONABOY:

Q. Are you able to see my screen here, Mr. Shandrow?

A. I do now, yes.

Q. And this is Exhibit C to the Asana and Headlands contract.

Do you see that?

A. I do, yes.

Q. And I'm going to highlight here, it says:

(As read) Further, each of the undersigned

hereby...and then it says...assigns to company as defined in the agreement it's right to bill and collect from patients for all professional services rendered hereunder.

Do you see that?

A. Yes, I do.

Q. And then it says that Headlands agrees not to bill or collect from any patient or payor for services rendered on behalf of group under the agreement; is that correct?

A. That is correct.

Q. So Headlands was not allowed to bill for -- other than to Asana -- let me start back over.

Other than billing Asana for services it performed, Headlands was not allowed to bill any





insurance payors for those services, correct?

A. For our client's, correct. Right? Yes. Right. We --

Q. For the services that Headlands provided to Asana patients, Headlands was not allowed to bill payors or patients for those services, right?

A. That is correct.

Q. Because Headlands assigned to Asana Headlands's ability to bill for Headlands services provided to Asana patients, correct?

A. Correct.

Q. So in that sense, Asana, when it billed insurance companies, was billing on behalf of Dr. Small and Headlands; was it not?

MR. SESTI: Objection. Calls for legal conclusion, misstates the document.

THE WITNESS: Correct.

BY MR. CONABOY:

Q. You, as Asana, relied on Dr. Small to perform his medical director duties in compliance with the law in your contract; isn't that correct?

A. That's correct, yes.

Q. And you relied upon Dr. Small and Headlands to prepare accurate medical records; didn't you?

A. Yes, that's correct.





Q. And in fact, the bills that Asana submitted to Blue Cross Blue Shield of Oklahoma and other payors were

based on the medical records that Dr. Small and Headlands prepared; weren't they?

MR. SESTI: Objection. Calls for speculation.

THE WITNESS: Yes, absolutely, in addition to the other services we provided.

BY MR. CONABOY:

Q. Well, you wouldn't -- Asana wouldn't submit bills without Headlands having prepared medical records; would it have?

A. No, absolutely not.

Q. So Headlands, by preparing the medical records, caused Asana's bills to be submitted to Blue Cross Blue Shield of Oklahoma; did they not?

A. Correct.

Q. And Headlands relied -- or Asana relied -- I'm sorry.

MR. CONABOY: Madam Court Reporter, could you read back my last question and answer?

(Question and answer was read back.)

MR. CONABOY: And Asana relied on Dr. Small and Headlands to prepare true, accurate, and complete medical records; did it not?

A. Correct, yes.

ROUGH DRAFT

Q. You were at Dr. Small's deposition last Thursday and Friday, weren't you?
A. Yes, I was.
Q. Did you hear Dr. Small testify that Dr. Small allowed non-physicians to sign his name on medical records that he had not reviewed for patients that he had not seen.
A. Correct. Yes, I did hear that.
Q. And is that the first time you've ever heard that in your life?
A. That he allowed -- yeah, absolutely. I mean, yes.
Q. That's a problem, isn't it?
A. Yeah. I mean, he must have given his code -- there's a code for a signature in Kipu -- to other people.
Q. So the records that bore Dr. Small's signature, indicating that Dr. Small had reviewed the medical records, those were false; weren't they?
MR. SESTI: Objection. Calls for speculation.
THE WITNESS: According to his statements, last week, yes.
BY MR. CONABOY:

Q. And again, in August of 2026, six years after commencing the relationship with Dr. Small, that's the



first time you heard that, right?
A. That is -- yes.
Q. So before, when you were testifying that Blue Cross Blue Shield of Oklahoma and others accepted the accuracy the medical records that Dr. Small prepared, nobody knew that they bore Dr. Small's ~~forged~~ signatures; did they?
MR. SESTI: Objection. Calls for speculation, assumes facts.
THE WITNESS: Correct. I mean, they had his signature on it, in multiple places, always.
BY MR. CONABOY:
Q. And you didn't know, for the past six years, that that signature was forged, right?
A. No, I did not.
Q. And it was Dr. Small that caused Asana to submit those false medical records to Blue Cross Blue Shield of Oklahoma; wasn't it?
A. In regards to his fraudulent signature, yes.

Correct.

Q. Now, Dr. Small's contract with Asana for his medical director services, requires Dr. Small, personally, to commit 15 hours per month to Asana as medical director, right?

A. As I read it, yes.





Q. Was last week the first time that you heard that Dr. Small was simultaneously the medical director at dozens of other facilities, in addition to Asana?

MR. SESTI: Objection. Misstates the testimony.

THE WITNESS: I was aware that he was the medical director for other programs, absolutely. To the extent, no. I was a little surprised.

BY MR. CONABOY:

Q. You didn't know that he was the medical director at, potentially, 100 places or more; did you?

MR. SESTI: Objection. Misstates the testimony, assumes facts, calls for speculation.

THE WITNESS: No, absolutely not.

BY MR. CONABOY:

Q. Had you known that Dr. Small was the medical director at so many places, and could not possibly dedicate 15 hours per month as the medical director at Asana, what would you have done in real time?

A. You know, we may have looked at another medical director because we did notice -- and Jonathon would be better -- for us, like, one of the most important things is when a client admits, is seeing the doctor. It's super important, right? When they get in, they've got to see a doctor. And we would see various response





times for that, which, you know, sometimes is a real big problem. Sometimes they were responsive. So I think it happens a lot. I see in this industry that companies scale, and the quality of service drops.

So I think we would have really seriously looked at that, and maybe found someone local that would come on site. There were always complaints about -- from clients -- that it was all virtual, and no one came on site.

Q. And in fact, did you hear Dr. Small testify during his deposition that there were some months when

he dedicated zero hours to Asana as the medical director?

A. Yes.

Q. The lack of time that Dr. Small dedicated to being a medical director at Asana, sitting here today -- I'm not talking about real time. Sitting here today, do you understand that the lack of time that Dr. Small dedicated to Asana as the medical director was a breach of the contract between Asana and Headlands?

A. Yes, absolutely. I mean, reanalyzing the contract, absolutely.

Q. Did you also hear Dr. Small testify that he dedicated -- or that he -- let me back up.

Did you also hear Dr. Small testify that he





delegated his medical director responsibilities to two non-physicians?

MR. SESTI: Objection. Misstates the testimony.

THE WITNESS: Yes. Yeah. He delegated to a bunch of people, as far as I remember, in his deposition.

BY MR. CONABOY:

Q. He said that he delegated his medical responsibilities, I believe, to Rochelle Harris and somebody with the last name of Plum.

Do you remember that?

A. I do now, yes.

Q. Do you consider that to be a breach of the contract between Headlands and Asana?

A. Yes, absolutely.

Q. Did you -- did Asana rely on Dr. Small as the medical director to ensure that nurse practitioners and physicians assistants were properly supervised when they provided care to Asana patients?

A. Yes.

Q. Looking back now, do you believe that Dr. Small violated that obligation as well?

A. I do, yes.

MR. CONABOY: Can we just take a break for





about five minutes?

MR. SESTI: Sure.

MR. CONABOY: All right. We'll be back.

THE VIDEOGRAPHER: Off the record. Time is 2:06 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:12 p.m.

BY MR. CONABOY:

Q. Mr. Shandrow, you said that you -- that Asana, in hiring Dr. Small as medical director, expected Dr. Small to perform his medical director duties in compliance with the law and the contract, correct?

A. Correct.

Q. Did Asana also rely on Dr. Small to perform compliance duties at Asana?

A. I mean -- well, he had to be in compliance, yes, him and his staff. Absolutely.

Q. Your brother testified -- Adam Shandrow is your brother, right?

A. That's correct.

Q. He testified last week that, if there was evidence of collections by Asana, for patients' payments for rent, transportation, or cost share, it would be reflected in Asana's general ledgers.

Do you agree with that?

A. I do agree with that, yes.

Q. Do you know that those letters have now been produced in this litigation?

A. They have been by me.

MR. CONABOY: I have no further questions.

MR. SESTI: I don't either.

MR. MCLEOD: Okay. Are we done? Can we go off the record, or do you need to clarify about signing -- review and signature. He will review and sign, yes.

THE COURT REPORTER: Great. Do you want me to send his copy directly to Mr. Shandrow, or would you like me to send it to a particular counsel to give to him?

MR. MCLEOD: Yeah. If you could send it directly to me.

THE COURT REPORTER: Okay.

MR. MCLEOD: You may -- let me see if you've got my correct contact information, Miranda, because if you are going off the notice, I think my e-mail address was misspelled. Let me just put that in the chat. That's the correct e-mail address for me.

THE COURT REPORTER: Great. Thank you.

And then, are there -- I know, Mr. Sesti, you

would get the original plus one copy.



Mr. McLeod, would you like one as well -- a transcript copy?

MR. MCLEOD: Yes, we'll take a copy, please.

THE COURT REPORTER: Okay. Great.

And then, Mr. Conaboy, would you like one as well?

MR. CONABOY: Yes. And if we could get a rough whenever it's available, we'll take that, please.

THE COURT REPORTER: Okay. Great. So a rough. I was just going to ask: Is the typical turnaround okay, or just the rough and then the regular time for the full and complete --

MR. CONABOY: If we could get a rough whenever it's available, even if it's pretty rough, that's fine.

THE COURT REPORTER: Okay. Fantastic. Okay.

I do have a couple spellings, but off the record. That's it for me.

THE VIDEOGRAPHER: We are going off the record. Time is 2:15 p.m. Thank you.

(Whereupon, the deposition was

concluded at 2:15 p.m.)